The next case on our calendar is Robin Colymore v. City of New York and certain individuals. Good morning, your honors. My name is Special Hagen. And I'm here on behalf of Appellant Robin Colymore. Appellant wishes to make the following arguments in support of her case for an appeal. Firstly, we're under the impression that the district court erred in the standard that it applied. Although it actually articulated the standard, the analysis was inconsistent with some of the case law. For example, with Appellant's First Amendment retaliation argument. Judge Swain cited the Zelnick v. Fashion Institute of Technology case. Erroneously, the year attributed to that decision was 2015. However, it was 2006, which coincided with the decision in Burlington North. And also, at that time, you know, the standard was different as far as defining a materially adverse employment action. Here's my problem with your hostile workplace environment. Oh, okay. I was still calling for the retaliation. I'm sorry. Let me jump ahead. Okay, so the retaliation. My problem with that claim and with the discrimination claim. The hostile work environment and the? Discrimination claim. Oh, okay. That all these things took place and that things were bad. I have difficulty seeing how you tie these bad things to your client being either a woman or being an African-American. I have difficulty finding that in your claim. Are you talking about the hostile work environment claim? Start with that one. With the hostile work environment claim, our argument is that the defendants displayed animus throughout the time Ms. Collymore was working at the Department of Information Technology. The complaint talks about the disparity in pay that she experienced between herself and a comparator by the name of Ms. Donahue. We compared the education, but also how Mr. Austin treated white employees versus black employees, specifically ignoring Ms. Collymore, ignoring other persons of color. What facts are alleged in the complaint to show that the animus was because of gender or race? Well, one of the conversations Ms. Collymore had with one of her coworkers, basically he approached her and said, well, you know, I don't think Mr. Austin treats white people the way he's treating you. That was just one example. Hearsay, isn't it? Well, no, he wasn't hearsay. He was actually there at the meetings. How is that admissible? Did that person submit an affidavit? Well, this is the pleading stage. We haven't even gotten to discovery or any of that. Fair enough, fair enough. But this is the complaint alleging that someone said this in a conclusory fashion? I mean, is that- Well, there's more to it than that. You had instances where Ms. Collymore had exchanges with Mr. Austin and Ms. Maloof. But there was also an instance, and I think we were talking about gender, where there was sexual harassment. My client alleges that Ms. Maloof engaged in numerous incidents of unwanted touching. The complaint doesn't, at least I don't see, allege that the touching was because of gender. Well, that was a question- She touched other people. She touched everyone, it turns out. No, we just said others. We never said everyone. We said others. And then it goes to the language which you would see in, let's say, in the red decision that this court actually decided back in 2012. Specifically, it's holding that- Does the complaint allege that the touching was because of her gender? The complaint doesn't necessarily allege that it was because of her gender, but my client perceived it to be sexual in nature. She was uncomfortable. She communicated that it was unwanted, and Ms. Maloof continued to touch her. And then on top of that, when she complained, she experienced retaliation over and over again. She complained several- She actually complained seven times within a nine-month period, and it was because it all started with the unwanted touchings from Ms. Maloof, and due to its repeated failure to address those unwanted touchings. So to actually try to get into the intent of Ms. Maloof would be an issue of fact, which would be more appropriate for a jury to decide. It doesn't have to be an allegation that it was because of gender. And my question is does that allegation appear in the complaint? We wouldn't say it was because of gender. We would say that it would be because of her perception that it was sexual and that she was in front. Element to this, right? The reasonable person, there's a question of whether or not a jury could reasonably find whether or not Ms. Maloof's unwanted touchings were sexual in nature. And that's the argument that we're making, that my client, a reasonable employee, found these repeated touchings no matter if she communicated to Ms. Maloof that she did not want to be touched, or if she moved objects between them, or she distanced herself. She continued to be touched. The complaint alleges that it was uncomfortable, that it was unwelcome, and you're standing here now saying that in her mind she thought it was sexual in nature. My question is, is that alleged in the amended complaint? Yes. Where in the amended complaint? Does it allege that the unwanted touching was because of your client's gender? Well, not necessarily because of her gender. Don't you need that to prove Title VII? Well, to a certain degree. It kind of touches on Onkali, for example. Onkali, you had same-sex employees, right? Same-sex harasser and victim. It's Onkali that says that Title VII is not a civility code. It doesn't cover, you know, slights, inconveniences. It's got to be. Politeness. Yeah, politeness. Respectfully, Your Honor. This was a touchy-feely person who was inappropriately touching, but was she doing it because of gender? And more importantly, is that alleged in the complaint? It's not necessarily alleged as far as it's because of her gender. It's because of the sexual connotation that my client interpreted and felt. In the Red decision, for example, there is language that says, when entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways, but giving up control over who can touch their bodies is usually not one of them. And in Red, the employee didn't necessarily ascribe the sexual harassment to any of the factors that are enumerated in Onkali. But the court nevertheless found that it was a violation of the plaintiff's civil rights in that case. Counsel, I know your time has expired, but I have a question for you. Yes, ma'am. Would you describe the retaliation that your client endured after complaining about Malouf and Austin in terms of protecting her health? Can you talk about that? Yes. My client suffers from migraine headaches. And initially when she started working for DO-IT, you know, it was controlled. She had no problems. But when she complained to Malouf initially in September of 2015, Malouf and Austin began to retaliate against her. One of the things they knew that my client needed, for example, was to take lunch at a certain time of day. And they started insisting that she work through that time. And they knew that if she did work through, that she would have a migraine headache. And what happened was they consistently started to harass her. They started to have her work through the lunch. She started getting migraine headaches. Do you believe that this treatment would deter a person of ordinary firmness in the making of a complaint? Yes. That's a good place to stop. Well, I have additional instances of adverse employment actions that had taken place. For example, they denied my client training. They started closely scrutinizing her work and surveilling her from day to day. They started having yelling matches with her, exchanging nasty e-mails, berating her at meetings, excluding her from various opportunities throughout the agency. So these were things that took place. And at one point, even though we believe that the judge should not have considered this, Mr. Austin had written her up for an alleged infraction. So all these things took place after my client complained of sexual harassment. And she did so seven times in this period of nine months. I wasn't talking about sexual harassment. I was talking about the retaliation. But the retaliation, yeah, the retaliation, but the complaints themselves were protected activities. And so there was retaliation as a result. Your time has expired. You have reserved some time for rebuttal. Yes, thank you. We'll hear from the city of New York. Good morning, your honors. May it please the court. Lorenzo DeSilvio on behalf of the appellees. This court should affirm the district court's dismissal for failure to state a claim of each of Ms. Collingmore's federal employment discrimination claims. I divide them up into three categories. The first is the sex-based claims. And as this court pointed out, there's no allegation that any of the conduct Ms. Collingmore alleges was motivated because of Ms. Collingmore's sex. And in addition, Ms. Collingmore, in a reply brief, cites this court's decision in law. But that case involved a reversal of the district court for failing to consider sexually overt, excuse me, considering only sexually overt conduct and not sex-neutral conduct in conducting a statute of limitations analysis. But in any event, the mall decision actually cites Alfano, cited in our brief, which says it is axiomatic that a Title VII claim must be because of sex. So affirmance of the sex-based claims, I think, is rather straightforward. Turning to the claims of harassment and discrimination on the basis of race, there's two independent bases that this court could affirm dismissal. The first is, as Judge Eaton pointed out, the conclusory manner in which the inference of discrimination was pleaded here. Regarding the harassment claim, Ms. Collingmore alleges harassment on the basis of race in only the most highly generalized terms. On page 23 of the record, she says that Austin Maloof's behavior was attributable to her race. She says that those supervisors took every opportunity to silence and humiliate her because she is black. And on page 22, there's an allegation that a white colleague by the name of Brummer pointed out to Maloof that she had never chastised anyone for completing their work early. But the only other part of that allegation that has to do with race is pointing out that Ms. Collingmore was the only person of color in that meeting. Looking at the- Why wouldn't that be enough on a 12B6 motion? Because here- Where the standard is just a minimal showing of discriminatory animus. Because there needs to be more than a threadbare recital made in conclusory terms, and that's what these allegations are. Well, there are many specific allegations about negative conduct. And there's an allegation that the plaintiff is black and that she was treated differently from whites. Is that enough? No, the city's position is that is not enough. But even if you were to disagree with the city's analysis regarding the conclusory manner in which she supports the inference of discrimination, there's still the case that there has to be a sufficiently adverse effect on her work, regardless of whether we're looking at her harassment claim or her treatment claim. Regarding her harassment claim, I think it's important to point out that the complaint is vague when it comes to certain key specifics. Specifically, what happened when. She has to show either severity or pervasivity, and I think those omissions are telling. Rispardo, this Court's decision says that the conduct alleged must be sufficiently continuous and concerted. It has to be more than episodic. We just don't know enough. I agree that in terms of a hostile environment claim, it's not pled because there's no allegation of severe or pervasive conduct. But in terms of disparate treatment, there are specific allegations of being treated differently from white employees. So why is that not enough on a 12B6 motion? Because there aren't enough specifics. Regarding the allegations that there was an adverse action flowing from the animus that Ms. Collymore ascribes to her supervisors, she alleges that she was sometimes denied overtime, but we don't know how frequently this occurred. There are two isolated shift changes, one in November of 2015 and the second in June 2016, the month that she resigned. But we don't know how long these lasted, and as the city argues in our brief, any shift changes have to be more than episodic. She argues that she was paid comparably to Ms. Donahue, not less than Ms. Donahue, with no allegation that she was paid less than someone similarly situated to her in all material respects, or that she was paid less than what she was entitled to. And she also alleges she was denied unspecified training opportunities. But the lack of specification means that there aren't facts sufficient to support an allegation of adverse effect. Ms. Collymore cites the Vega decision from this court to say that the court should look at the entirety of the universe of allegations, but Vega makes clear that there must be at least one adverse employment action, and I believe Ms. Collymore effectively concedes that she cannot identify any single action that was sufficiently materially adverse. And it's unclear how she- Not forcing her to work through her lunch hour when she needed to eat lunch to protect against migraines. So my understanding is that relates to her constructive discharge claim, which I believe is a component of her disparate treatment claim, and that's not enough. If you look at this court's decision in- No, it's not. If you want to jump to the retaliation component, there's just not any allegations to show how frequently this occurred, what effect it had on her work, and given that the standard for- But wait, at this stage of the proceedings, right, we're drawing all inferences in favor of Ms. Collymore, aren't we? That's correct, but an omission is not an inference you can draw in her favor when she fails to describe, except in the most conclusory terms, the frequency- She did her work through lunch, and it gave her migraines. On occasion, but turning to the Fincher case from this court, if this court agrees that hostile work environment has not been stated, then by necessary implication she has not stated a claim for constructive discharge either. And an additional reason why constructive discharge is not made out is it requires intentional action on the part of the employer, and here that's the sole allegation regarding Austin Maloof's knowledge of her health, was that she had migraines, had to eat lunch at a certain time. She made her work through lunch, which exacerbated her condition, right? Yes, that's correct. Even if it was once or twice, isn't that true? Even if it's once- I don't know if it's once or twice. I don't know if it's once or twice either, but she claims it was in retaliation for making complaints. Isn't that correct? That's correct, but to answer your question, there's just not enough given that a reasonable person's standard is what is required to say that having to work through lunch on occasion allows you to make out either a constructive discharge claim or a retaliation claim. Having headaches? Having to work through lunch once in a while? Sounds serious to me. The city's position is that it would not dissuade a reasonable person from complaining or speaking out if we're looking at the retaliation component, and that it does not make out a constructive discharge claim, but there's an additional reason why, as to the retaliation claim, she has failed to state a claim for retaliation, and that's because- Our case law does not require that every factual allegation be included, right? It's just whether there's enough to state a plausible claim. I mean, that's where I'm struggling with this, is whether there's enough to at least start the litigation. There is not enough because the allegations are made- I know you feel that. Explain why. Sure. Well, I was hoping to answer, Judge, your question about the retaliation claim. There's an additional reason why the retaliation claim fails here, and that's because it's incumbent on Ms. Collymore to allege that her complaints substantially motivated any of the conduct, but here there's telling omissions from the complaint. Ms. Collymore relies on the Vega decision and the fact that you can show causation indirectly through temporal proximity, but the case law makes clear that there have to be complaints followed closely in time by retaliatory conduct. Here, however, there's only four specific instances of mistreatment that Ms. Collymore alleges that have specific dates attached to them. They are the unwanted touching starting in September 2015, there's the two shift changes in November and June, there's four enumerated instances of either Austin or Malouf yelling at her in November, December, January, and then several months later in June, and then there's one disciplinary write-up in January of 2016. Other than highly conclusory allegations that within days or within weeks of allegedly making complaints bad things happened, there's just not enough to support an inference that any of the complaints Ms. Collymore made substantially motivated any of the conduct she alleges on the part of her supervisors. Of the dates that you just mentioned, which of these happened after the plaintiff complained? Well, I think it depends on which of the complaints you're looking at. She complained in September 2015 to Malouf about unwanted touching. That same month she complained to agency staff, she doesn't enumerate who, about sexual harassment. The meeting that she had with Austin where Austin allegedly gave a directive to hide information from the Department of Investigation, that was not until December 7th, and sometime thereafter she complained to a union representative. On January 15th she complained to a woman named Emily Johnson and a man by the name of Driscoll who were responsible for enforcing Dewitt's Code of Conduct and Ethics. She complained to Kirk's that month, but that was about Austin yelling at her and what she describes as discriminatory conduct. She did not complain to Kirk's about Austin's alleged instruction to hide information from the Department of Investigation until June 22nd, 2016, six days before she chose to resign from Dewitt. And then there's several other complaints, but she doesn't allege that she made an E. So the last one of the – you went through the dates that you know about or we know about with respect to things occurring. Which of those occurred – did they all occur before the first complaint? The first complaint – You have the date for the first complaint. So the first complaint she made I think is in September 2015 about the unwanted touching from Maloof, and she made that to Maloof herself and to agency staff according to the complaint. This is on pages 20 and 28 of the appendix. But there's just not allegations that close in time to that any specific conduct started. She really lumps everything together, and in her brief she effectively concedes that necessarily, and this is on page 40 of her brief, Austin Maloof would have engaged in conduct in continuing behavior that would not be specific to any one given complaint or protected activity during the course of her 11 months at Dewitt. And I think that's quite telling. This court should affirm unless there's any further questions. Thank you, counsel. Thank you very much. Ms. Hagan, you have three minutes for rebuttal. May it please the court? There are several points that I'd like to address that counsel raised. First off, all of the adverse employment actions took place after Ms. Collymore initially complained in September. September she complained to Maloof about the unwanted touchings. The first adverse employment action that she experienced was the change in shift, as counsel pointed out, in November. So there you have at least two months. But to go back to the bigger, I guess, holding in this circuit, was that there's no fixed time that the court has described to temporal proximity in this instance. There have been cases that have found up to nine months to be sufficient, I mean still enough, to kind of link the protected activity to the adverse employment action. But we don't have that here. We have a series of complaints that have been made within a nine-month period. We have seven complaints by Ms. Collymore made within a nine-month period. And in between those complaints, she experienced unwanted touchings. I mean, not unwanted touchings, but adverse employment actions. So that's one. And you asked at one point, how often these migraines took place. In the amended complaint, in paragraph 77, appendix 21 through 22, we talk about Ms. Collymore missing more and more days of work. And the migraines taking place on a regular basis because of Mr. Austin and Ms. Maloof's insistence that she work through lunch. So you went from an employee who never missed work to someone who frequently missed work. And discovery will show in our belief that these migraines took place because she was continuously harassed. There were questions about her attendance at work because she was constantly missing work because of their insistence in the harassment. Working through lunch exacerbate her migraines? Yes. The frequency. In fact, to the extent that she had so many of them that when she resigned within four months, she was diagnosed with a brain aneurysm. And then council also tries to downplay to some degree the disparate treatment, specifically between Ms. Collymore and the other white staff in the unit. Specifically, she was being yelled at. Her work was being sabotaged. She was belittled in front of her staff members. The white staff members were not treated that same way. And I believe that a reasonable juror could find plausibly that she experienced disparate treatment based on her race. But also, I just wanted to talk about the First Amendment retaliation claims. First off, it was clear that Ms. Collymore complained at least twice. She complained to her union representative, the labor representative, Mr. Driscoll. And that's one instance that she complained to Kirk's. Now, when she complained the first time, which was in January, within the same month, Austin yelled at her. And he attempted to bring her up on disciplinary charges. That was in January. So she complained in January. She had an altercation. Well, Austin had an altercation with her in January. And then also attempted to bring her up on disciplinary charges for violation of the code of conduct. And that's pleaded in the complaint. And then in June, she complained to Mr. Kirk's. When did she leave, actually? She left in June, after she filed an additional three or four complaints with the EEOC, the internal EEO office, who she repeatedly complained to, who did not investigate any of the complaints. And I wanted to bring that up for the Monell purpose, because we did plead a policy and custom of the agency itself not investigating the EEO complaints. Citing specifically a complaint with the City Commission of Human Rights, where the person alleged the same thing, that the agency did not investigate the complaint. And the EEO officer and his subordinate also acknowledged that they did not investigate Ms. Collymore's complaint in April. And that's when she complained of sexual harassment by Ms. Maloof a second time, and the agency failed to act. So I wanted to try to touch on all the bases to show that we pled enough at this stage for a reasonable juror to plausibly find that Ms. Collymore could possibly have experienced retaliation, at least under the First Amendment. Retaliation under at least Title VII and the New York City and New York State Human Rights Law. And also hostile work environment, I mean, I would say disparate treatment more so than hostile work environment. To the extent that she experienced disparate treatment based on her race from her co-workers, specifically Mr. Austin and Ms. Maloof. Thank you very much. Thank you both. We'll reserve the decision.